Good morning, your honors, and aloha. I have the privilege and responsibility this morning of speaking on behalf not only of Michelle and Natalie and their parents, who are here with us in the courtroom, but also on behalf of their lead counsel, Stan Levin, who for the last ten years has been fighting to get this family to stay in court. This case was filed in April of the year 2000. It is long past time for this family to have its case submitted to a jury. Now, it's a daunting task to distill over ten years of litigation into fifteen minutes, but I think this case really boils down to three points. First of all, the state knew that Michelle and Natalie were autistic and therefore required educational services that were specific to autism and related mental health services in order to have access to a meaningful education. Secondly, the state knew that these educational and mental health services were available, and the state knew that the failure to provide these services was a violation of their federal rights, and not insignificantly, the state also knew that a failure to provide these special educational services and related mental health services put these children at grave risk of permanent and serious injury. And third, the state failed to provide the services. This is a textbook case, I submit, of deliberate indifference. The state, with knowledge that a harm to Natalie and Michelle was substantially likely, I'm sorry, with knowledge that a violation of Natalie and Michelle's federally protected rights was substantially likely, and with that knowledge failing to act on that likelihood, the case, the state has, with deliberate indifference, violated these children's rights. At this stage, all that you have to persuade us of is that there are material issues of fact that are in dispute on these principal points, because otherwise you can't have some judgment. Precisely. And the record here is overflowing with issues of fact. And, you know, I can take the court through the factual record on each of these points, but if the court has specific, because this record is so voluminous and the issues are so complex, if the court has specific questions, I'd be happy to address those. Otherwise, I'll simply go through the factual record and point the court to the issues of fact that I think preclude summary judgment. The backdrop to this case is, of course, the Felix lawsuit, the Felix summary judgment decision by the district court, and finally the Felix consent decree, and actually finally the Felix contempt citation. And that provides the framework within which this case arose. The girls entered the special education system, Michelle in 1994, Natalie in 1995. They were known to be autistic. At that time, the Department of Education knew that children with autism required special education targeted for autism in order to meaningfully access education. The department knew that. The department knew that. It's clear on the record. We have the Felix consent decree itself, which in part addressed autism as a condition, and specifically involved the state's consent and agreement to provide mental health services. And that was entered in 1994, the same year that these girls were entering the public education system. We have Dr. Campbell, who appeared as the Rule 30p6 witness, the person most knowledgeable regarding the services that were available at the time, who testified that the full array of educational services for autism and related mental health services were available at the time, and that it should have only taken a couple of months to get those in place for Michelle and Natalie. We have the, and I think this is a very significant piece of evidence, we have Dr. Margaret Coven's letter in 1994, in which she talks about having visited with the children and diagnosed their autism. And here's what she says. My impression is that Michelle, she's talking now about child autistic spectrum disorder, or pervasive developmental disorder, with normal intelligence and no negative behaviors. Her parents are sensitive, intelligent, and anxious to help her. The Department of Education preschool program is the most appropriate option, as Michelle has delays in multiple areas of functioning. Michelle will need some very special services in order to progress. Since she has high potentials, it would be a shame to limit services at this critical intervention time. Below are my impressions and recommendations for her program. If I can be of further assistance, contact me. Here are some other places you can go for care. What were her credentials? Dr. Coven was a psychologist employed by the State of Hawaii Department of Health in its Zero to Three program, and so this was right within her scope of work for the Department of Health. And of course the Department of Health was the companions of the Department of Education under the Felix Consent Decree. The Department of Health was to provide the mental health services, which are so integral and indispensable to the specific educational strategies targeting autism. Now the state admitted when they were asked in open court, what was your response to Dr. Coven's letter, that they failed to implement these very clear recommendations. Now at the same time that Dr. Coven was evaluating Michelle, she noticed Natalie in the home, who was a year or so younger, and had concerns about Natalie, that Natalie may have some of the same problems. And in a Department of Education IEP conference, which was held on July 7th in 1995, this is what the report of the relevant medical developmental data says about Natalie. Natalie was referred to the Wahiawa Infant Development Program in June of 1994 by Dr. Margaret Coven, psychologist, after she conducted an evaluation of Natalie's older sister for similar concerns with Natalie, such as repetitive play, putting toys in her mouth, so on. Dr. Coven also noted that Natalie was making extremely slow progress in communication and social development skills. A neurological evaluation was conducted on February 8th, 1995 by Dr. Brian Ohara, neurologist. Dr. Ohara stated Natalie has, quote, definite signs of autism, which has also occurred with her older sister, end quote. So this is the Department of Education recognizing in July of 1995 that Natalie also has autism, as diagnosed by her Kaiser physician. And incidentally, the Mark H. decision actually got that wrong in terms of the date. They had it indicated as happening in 1996, but it actually was in July of 1995. So in 1994 and 1995, we have diagnoses of autism known to the Department of Education for both Michelle and Natalie. At that time, the services, the special educational services for autism were readily available. And it's important to understand that it's essential that these services be implemented at the earliest possible time. Because what they do is they provide the foundation for all educational development subsequently. You have to learn communication skills. You have to learn social interaction skills. You have to address behavioral problems in order for the child even to have the opportunity to learn. To deny those services at this early age when they were first identified at ages three and two is essentially to bar the door to the classroom. And that's really what this case is about. They knew these children needed these services in order to have a meaningful education. They knew the services were available. And I'll talk about that in a moment. And yet they failed to provide the services. How did they know they were available? How do we know, based on this record, they were available? Well, we have, obviously, Dr. Colvin's letter. We also have the reports that were written and submitted to the trial judge by Dr. Dan Legoff. And I commend those reports to you as a perfect blueprint for this case. Dr. Legoff is not only an expert in autism and an expert in this case, but he was a treating psychologist for these girls. So he's both a recipient witness and an expert witness. His reports, which are in the record, both his January of 2001 report and his report in 2003, will lay this case out for you in exquisite detail. And what he does in there is he describes the literature that was available at the time, which shows that autistic children generally don't benefit from traditional mainstream educational strategies. That in order to develop, they have to have these special services, which are in part mental health services. And the data that was available then and is available now is striking. The data is that without these services, there's a good chance that these children will end up in isolation with no social skills, no communication skills, totally dependent in all activities of daily living, with profound mental retardation. But with these services at the earliest possible juncture, these intensive services, there's a better than 50% chance that they can have an almost normal life. That's what the literature said then. That was known to the Department of Education. That's what the literature still says. In fact, there's a 2001 decision by this court in the Amanda J. case, in which the court specifically talks about the data that is available and points out that these early services are absolutely essential. And I want to just read you briefly from that case. Quote, without early identification and diagnosis, children suffering from autism will not be equipped with the skills necessary to benefit from educational services. And then the case goes on to say, thus the available research strongly suggests that intensive early intervention can make a critical difference to children with autistic disorders. That's what this case is about. These children were in schools that existed. As Dr. Rudolph points out, blocks from where these children were in school, there were three highly skilled autism specialists who were providing services to public education children. And yet Natalie and Michelle were left out. They dropped through the cracks. It's a tragedy what happened to these children. And they are due their day in court. How are they today? How are they? They are unable to communicate effectively. They are totally dependent on all activities of daily living. They will probably require for the rest of their lives 24-hour day care, essentially. I mean, they have not progressed significantly despite intensive interventions that were finally begun after the family pursued its due process rights and won the administrative hearing. And that's, what that demonstrates is how critical it is. How old were the girls when this intervention took place? Well, the interventions began in 1998 and really didn't ramp up until around 2000. So, you know, they were 9, 10, 11 in that age. But what the literature indicates, the scientific literature, would be Dr. LeGoff, Dr. Bateman, Dr. Siegel. You've got to get them when they are very, very young. You've got to get them when they are young because you are providing them with the tools to learn. And without those tools, you can doom them to a life of dependency, isolation. And that's what, unfortunately, tragically happened in this case. I'd like to reserve. I'd be happy to answer any questions. I know this is a very complex factual record as well. Thank you. Well, we have from the State Department of Education. May it please the Court, my name is Dorothy Sellers. I represent the State Department of Education. And we're here today to ask the Court to affirm the summary judgment. Can you speak louder? Hold it down to you. Thank you. All right. Is this better? Thank you. And we're asking the Court to affirm the summary judgment that was granted in favor of the State. And I think the starting point is we need to go back to... Oh, I can barely hear you. I'm sorry. The starting point is we need to go back to the Administrative Hearing Officers Decision of 2000. And there is, and we admit it, no question, that these children were denied IDEA FAPE. And then we need to take a look at the opinion, the prior panel opinion in this case, which remanded for further proceedings and laid out what was supposed to happen. And what was supposed to happen was that plaintiffs were to come forward and identify, for purposes of their 504 claims, exactly the regulations that they were claiming under. Well, Judge Berzon did that for them, didn't she? Well, to large part, she did. And then plaintiffs filed an amended complaint that refers to Regulations 104.4 and 104.33. And that was how they were going to prove their Section 504 case. Because we're never, we're not disputing that everything the hearing examiner said was right in 2000. But the problem here is the intent to convert this to a 504 claim. Okay. So... Well, they're different, but they're not worlds apart. That's true. And I guess with regard to your argument on meaningful access, I have difficulty understanding how you can obtain summary judgment in a context where we have the Hearing Officer Report in 2000 or 99 detailing all the deficiencies of what the state had done before then. Well, there is a requirement of meaningful access that traces back to Alexander v. Choate. And there's no reference to meaningful access in the statute or in the regulations that are at issue here. But what we do have is a definition of meaningful access is some access which comes from plaintiffs themselves, in this case, in their motion for summary judgment. And it comes from the opinion by Judge Kaye in the district court that denied a new trial in the Wiles Bond case in which addressed similar issues. So, while meaningful access is required, it's never been really defined except for in the case. But you had an argument to us. This is your caption. The district court correctly ruled there was no genuine issue of material fact as to meaningful access. So, whatever you meant by meaningful access is what I'm talking about. All right. This is what we mean. We're on board with Judge Kaye when he says some access. We're on board with plaintiffs at page 30 of their motion for summary judgment when they say meaningful access means, at a minimum, some access. And the question here is whether there was some access. Let me pause there and say, is there any other authority at site that some equals meaningful? Because some doesn't usually equal meaningful. I don't ordinarily read it that way. Well, possibly it depends on what the some is. And I just want to make sure that the record here is that there was meaningful access in some sense. They were transported to school. There were other children in the self-contained classroom. They were mainstreamed for purposes of field trips and lunch and recesses and assemblies and laundry. But did you get any direct treatment for autism? Yes, we did, although under, we think, a different name. And one thing I would ask the court to do would be to look at the supplemental excerpts of record that we filed, which would be tab 4, page 14. And it shows that there were some minutes per week of speech therapy. But it also showed that there were 30 hours a week of special education. Isn't that a subject of dispute which ought to go to trial as to whether this was meaningful or not? I'm not sure because of the admission by plaintiffs that some access is meaningful access. I mean, they did get some access. And the question is whether it crosses over the 504 line. As I understand the treatment for autism, it's very intense, it's very specific, and it's provided by specialists who can work to help them develop the capacity for communication, for a sense of belonging, all sorts of very specialized intensive work is required for autism sources. Adapted to each child. Excuse me? Adapted to each, the program that is specific for each child. Yes, that's correct. And it would be part of the IEP. Each child. Yes. So what it seems to me is that there is dispute in the record as to whether this was sufficient or adequate and that this needs to go to trial. Well, I think not, Your Honor, because the remand was so the plaintiffs could point out why the regulations were going to be helpful to them and why the regulations would allow them a trial and a plausible claim under Section 504. But the regulation requires the meaningful comparison between what services are being handicapped and that comparison was not made on the remand. But that's only one part of the picture. Well, it's a fairly large part when you have a Section 504 claim and what you're claiming is lack of meaningful access. There has to be a comparison of what was available as between handicapped and non-handicapped children. There is a fact question whether you have meaningful access. Well, it's also a legal conclusion at some point. Well, that's something for a prior fact to decide. Well, Your Honor, in addition to the fact here that plaintiffs did not provide any evidence of comparative access or of comparative accommodations to their children. Well, let me ask you this. Okay, we have Judge Berzon's opinion. And so the issue is whether the District Court erred in granting summary justice in favor of Hawaii Doe on the H Families Rehabilitation Act and Regulation 10433B claims. It's under those claims that the family can get money damages, right? I think under Judge Berzon's analysis that those claims would support an implied right of action, yes. Yeah, for damages. Yes. Yeah. Okay. And to survive summary judgment on their rehabilitation, Act claim the family must establish issues of material fact with respect to two elements. One, Hawaii Doe denied the girls meaningful access to the benefits of a public education by denying them reasonable accommodation. And two, did so with deliberate indifference. Yes, but the first part of that under the regulation is tied to the comparative analysis, I believe. And to survive judgment on the Regulation 10433 claim, the family must establish issues of material fact with respect to three elements. Hawaii Doe violated Regulation 104.33 by failing to design, failing to design, that here are the italics, Michelle and Natalie's IEPs to meet the girls' educational needs as adequately as the needs of non-disabled students are met. And two, that the failure denied the girls meaningful access to the benefits of a public education. And then we have the three is deliberate indifference. It seems like there are disputed issues on all of those. All right, what page were you reading from? I was reading from my own notes. You ought to come up here, I'll show them to you. All right. Well, I take that from Judge Berzon's, you know, incredibly intelligent opinion. Well, um. You don't have to adopt the adjectives. It is what it is. And given that, I think the hard question is how you get a summary judgment in the context with those being the questions and this being the record. Well, we got the summary judgment because, as I said, the remand required plaintiffs to come forward and identify how those regulations. But the summary judgment wasn't granted on that basis. Judge Riehl's decision doesn't say this regulation doesn't provide a private cause of action. Right, and you go back. And you didn't argue that to us. And you're brief. You're not saying there's not a private right of action here. No. You're saying that the facts here don't support, that's why you can make it to the jury. And I can't figure out how that could possibly be the case. The 2000 hearing officer report is pretty damning. And so how can you say that, well, they didn't show that they treat other students, don't treat other students just as badly as they treated these plaintiffs. Because these plaintiffs still have the burden of proving under the statute itself, discrimination solely on the basis of the disability. What's the support you cite to say that they have to demonstrate that there's no other source of discrimination? I think it's the word solely by reason of. And the other point that would counter it. My question is where do you get the word solely from? From the statute itself, Section 504. That's the question. And the problem, one problem that we've raised is that there's no showing, there's no... You identify another source of explanation for why it is they didn't get the services they should have gotten? No, it goes a little bit, Judge Clifton, to the deliberate indifference element that everyone agrees is there. And our position has been that all they've done all these years is to say, Felix, Felix, Felix. And I think Judge Real got it exactly right in his order saying, Felix is not covering specific cases. You still have to show in these specific cases that there was a harm to these children. Is there going to be difficulty showing that these children didn't receive services?  We've already determined that. But it's going to be difficult to show that any school system would act with intentionality or solely by reason of disability. Are you going to offer up another explanation? Yes, and that is the bureaucratic inefficiency explanation. That may qualify as deliberate indifference. That's kind of the definition of deliberate indifference. No, but it turns out to be in the case law an escape from deliberate indifference. All these issues, they have to be decided by a trier of fact, whether that be a judge or a jury. Well, I'm not sure that the deliberate indifference prong is not... Are there any cases that supports granting summary judgment for the state on the ground of not sufficient proof of deliberate indifference? Both Judge Ezra and I think Judge Kaye, but I'm not sure about that, have said you can't prove that deliberate indifference solely by reference to the prior case, prior to the Felix case. You can't use Felix to say deliberate indifference. You have to look at each specific situation. And the problem with the Felix case, and the problem with that whole analysis, is that it paints with too broad a brush. It's saying, you have this general problem that applied to every specific person in the class, and that's not true. That just doesn't make sense logically, to convert a general to these two specific girls. How many children with autism are attending public schools here? Your Honor, there are, this is in our brief, some 21, this is ballpark, there's some 21,000 students in special education. There may be 12 to 1400 who are somewhere on the autism disorder spectrum. That is, so basically we think that in terms of the plaintiffs carrying their responsibility to prove deliberate indifference, that has not been done, because all they do is say Felix, Felix, Felix, and that doesn't make sense logically, and it doesn't correspond with at least the law of the District of Columbia, the District of Hawaii. And I don't know that any other state has the consent decree problem that the State of Hawaii does. Thank you. Well, OK. Rebuttal, if any. Two very quick points. First of all, these duties that the state didn't arise with Felix. These duties arose in the 1970s. They were there throughout the 80s. In 1991, the U.S. Department of Education told the State of Hawaii that it was in violation of the Rehabilitation Act because it wasn't providing these services. The real question, I think, I believe it was Judge Clifton asked is, how do you get to summary judgment on this record? And believe me, we scratched our heads with that. But I think the answer is the trial judge. You've got to get the judge real, that's the answer. And that was my last point. We've got to have a reassignment in this case. And I did. Thank you. We got it. He's not a bad fellow, though. I like him. All right. To the next one. United States vs. Gaytan Ayala. Morning. You notice as soon as you get up here, the audience leaves. What can I say? They've heard me before.
judges: Fletcher B. , Pregerson, Clifton